UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CIV-81047-ROSENBERG
MAGISTRATE JUDGE P.A. WHITE

GUILLERMO FUENTES,                    :

       Plaintiff,            :

v.                                    :        <u>REPORT OF</u>
                                               <u>MAGISTRATE JUDGE</u>
JULES HELLER, M.D., et al.,    :

       Defendants.           :
_____

## <u>Introduction</u>

Plaintiff Guillermo Fuentes has filed a civil rights action raising claims under § 1983. Pertinent here, the case is proceeding against Dr. Jules Heller, M.D., on Eighth Amendment theories of deliberate indifference to his serious dermatological and ophthalmic needs, and against Warden D.L. Stine and GEO Group, Inc., based upon an alleged custom or policy of delaying inmates' medical treatment, and an alleged custom or policy of failing to provide sufficient funds and staff to meet the medical needs of the inmates at South Bay Correctional Facility.

The cause is before the Court upon Dr. Heller's, and Warden Stine and Geo Group's, motions for summary judgment. (DE#65, 66). The Court has considered the motions, Plaintiff's consolidated response thereto (DE#78), Dr. Heller's reply (DE#79),[1] and Plaintiff's surreply (DE#80).

## <u>Undisputed Material Facts</u>

1. Plaintiff Guillermo Fuentes has a chronic dermatologic condition and recurrent ophthalmologic condition.

_____

[1]Warden Stine and GEO Group have not filed any reply.

2. Plaintiff has been in the custody of the FDOC since 1995 following a conviction for first degree murder, and has been housed at various facilities within the State of Florida since his incarceration.

3. On April 24, 1995 Plaintiff was given a shot for Tuberculosis ("TB") upon arrival to the South Florida Reception center. (DE#1, ¶1).

4. Following the shot for TB, Plaintiff began to swell and developed a severe skin rash. (DE#1, ¶2).

5. On May 30, 1995 Plaintiff arrived at Hendry Correctional Institute and was given a TB pill that again caused swelling and a severe rash. (DE#1, ¶¶5-6).

6. Plaintiff was referred to dermatologists and treated with various creams and ointments for the severe rash prior to his arrival at South Bay Correctional Facility ("South Bay"). (DE#1, ¶¶7-13).

7. Plaintiff was transferred to South Bay in May of 2010. (DE#1, ¶15).

8. Beginning February 22, 2012 and continuing to the present, Dr. Heller was the medical director of South Bay. (See DE#65, Exhibit A)

9. During the pertinent times related to Plaintiff's Complaint, Plaintiff was seen and evaluated by Dr. Heller numerous times, prescribed multiple medications, referred to outside specialists, given accommodations for his complaints and conditions, and followed up regularly. (See DE#65, Exhibit A).

10. Dr. Heller saw Plaintiff on March 2, 2012, when he complained of a rash and indicated he had skin discoloration since 1995. Dr. Heller issued a med pass and ordered Keflex for seven days to treat the rash. (See DE#65, Exhibit B, Bates number 702).

11. Dr. Heller saw Plaintiff again on March 26, 2012, and Plaintiff did not complain about his skin condition. (See DE#65, Exhibit B, Bates number 174).

12. Dr. Heller saw Plaintiff next on May 10, 2012, and he had skin-related complaints. Since the previous medication appeared to have worked, Dr. Heller ordered the same medications, Naproxen and Keflex, for a fourteen-day course. (See DE#65, Exhibit B, Bates number 170).

13. When Dr. Heller next saw Plaintiff, on June 27, 2012, he had no complaints related to his skin condition. (See DE#65, Exhibit B, Bates number 166).

14. On July 5, 2012, Plaintiff requested a "no shave pass" because he was having skin irritation. Dr. Heller issued the requested no shave order and also prescribed a hydrocortisone cream. (See DE#65, Exhibit B, Bates number 709).

15. Dr. Heller also approved cotton bedding, long sleeve shirts, boots, a straw hat, sunblock and other accommodations for Mr. Fuentes to alleviate skin related discomfort. (See DE#65, Exhibit B, Bates numbers 163, 164, 350, 351, 397, 447, 451, 482, 483, 531, 586, 662, 686, 707, 710).

16. On October 22, 2012 Plaintiff had complaints about his skin condition and Dr. Heller examined him and ordered topical steroids and Prednisone. (See DE#65, Exhibit B, Bates number 674).

17. In addition to medication management, Dr. Heller also made dietary changes in an effort to minimize Plaintiff's skin irritation. (See DE#65, Exhibit B, Bates numbers 664, 668).

18. On July 9, 2013, Dr. Heller ordered Vistaril three times a day which is a known treatment for various skin conditions, but Plaintiff refused the treatment as ordered. (See DE#65, Exhibit B, Bates numbers 452, 660).

19. On July 23, 2017, Dr. Heller's colleague, Nurse Practioner John Wade, documented that there was improvement in Plaintiff's skin condition. (See DE#65, Exhibit B, Bates number 658).

20. Thereafter, on December 30, 2013, a consultation for a Dermatologist was approved. (See DE#65, Exhibit B, Bates number 648).

21. A biopsy was performed and on March 8, 2014, the results confirmed that Plaintiff had a dermatitis. He was put on prednisone, which is a medication Dr. Heller had previously prescribed for him. (See DE#65, Exhibit B, Bates number 640, 744).

22. Plaintiff had a flare up of his skin condition and was treated by Dr. Heller's colleague on April 16, 2014. He was given Solumedrol and Benadryl and followed up several times and, according to the chart, improved with treatment. (See DE#65, Exhibit B, Bates number 635).

23. Although Plaintiff was seen numerous times for other medical complaints and wrote numerous grievances, he did not complain of any skin irritation for almost six months. (See DE#65, Exhibit A).

24. On January 18, 2015 Plaintiff made a sick call request requesting a renewal of his prior medications due to skin irritation. (See DE#65, Exhibit B, Bates number 604).

25. Dr. Heller saw Plaintiff on January 26, 2015 and ordered Clobetasol Cream. (See DE#65, Exhibit B, Bates number 600).

26. Dr. Heller ordered Naproxen on December 29, 2015. (See DE#65, Exhibit B, Bates number 567).

27. Plaintiff was prescribed Triamcinolone cream on April 11, 2016. (See DE#65, Exhibit B, Bates number 560).

28. Plaintiff was prescribed Triamcinolone cream and Tar Shampoo on March 10, 2016. (See DE#65, Exhibit B, Bates number 562).

29.   Plaintiff was again prescribed Triamcinolone cream and tar shampoo on June 7, 2016. (See DE#65, Exhibit B, Bates number 547).

30. During Plaintiff's incarceration at South Bay, Dr. Heller was aware of his ophthalmologic condition and continuously, diligently, and repeatedly cared for Plaintiff relative to this condition. (See DE#65, Exhibit A).

31. Plaintiff was seen multiple times by ophthalmological consultants. (See DE#65, Exhibit B, Bates numbers 628, 709, 742, 743, 751, 763).

32. Plaintiff was seen by Dr. Brennan in the eye clinic on October 16, 2013. Following that evaluation, Dr. Brennan ordered glasses. Dr. Brennan did not order medication, nor did he order a follow up appointment or a referral to an ophthalmologist. (See DE#65, Exhibit B, Bates number 652).

33. Plaintiff was seen by Visual Health on April 4, 2014. The documentation following that consultation, from Dr. Rynerson, confirmed that there was no eye pain, no redness, no tearing, no poor vision, and no loss of vision. The conclusion was that Plaintiff's ophthalmologic conditions, both his cataracts and pterygium, were stable and the plan of care was to monitor the conditions for worsening. (See DE#65, Exhibit B, Bates numbers 756, 772, 777).

34. Plaintiff saw Dr. Brennan again in the eye clinic on August 20, 2014 complaining that his condition had worsened and the glasses were not helping. Dr. Brennan did not order medication but did refer Plaintiff to an ophthalmologist. That referral was denied by Utilization Management on November 5, 2014. ("UM"). (See DE#65, Exhibit B, Bates numbers 617, 628).

35. Plaintiff noted in his grievance documentation of December 31, 2014 that Dr. Heller was the one who instructed him on how to

proceed in terms of pursuing the grievance following the denial by UM. (<u>See</u> DE#65, Exhibit B, Bates number 488).

36. Plaintiff pursued his grievance and another ophthalmological consultation at Bascom Palmer was received and approved by UM on March 19, 2015. (<u>See</u> DE#65, Exhibit B, Bates number 595).

37. While waiting for his outside appointment, Dr. Heller wrote an order for artificial tears to alleviate Plaintiff's discomfort. (<u>See</u> DE#65, Exhibit B, Bates number 198).

38. Plaintiff was seen at Bascom Palmer on August 10, 2015. The results of that ophthalmological consultation confirmed that a pterygium was present on the left side and cataracts were present bilaterally. Although surgical options were discussed, no surgery was ordered following this examination. No medications were ordered following this examination, and no documentation of Plaintiff complaining of visual disturbances were made in the medical record following this examination. (<u>See</u> DE#65, Exhibit B, Bates number 582).

39. Notwithstanding that there was no order for the surgery and no indication that it was urgent or emergent, Dr. Heller signed off on having the procedure scheduled. (<u>See</u> DE#65, Exhibit A).

40. Following Plaintiff's transfer he was once again referred to an outside ophthalmological consultant on or about July 2, 2017. (<u>See</u> DE#65, Exhibit B, Bates number 352).

41. The documentation from Plaintiff's recent consultation found that surgery was not warranted, that Plaintiff did not meet the surgical criteria, and that although he claimed he was unable to see, he was able to read the paperwork without difficulty when asked. (<u>See</u> DE#65, Exhibit B, Bates number 403).

42. Warden Stine was the Warden at South Bay Correctional Facility from June 3, 2013 through July 17, 201 6. (<u>See</u> DE#66, Exhibit A, ¶1).

6

43.  After leaving South Bay Correctional, Mr. Stine was the Warden at Moore Haven Correctional Facility from July 18, 2016 through March 26, 2017.  (See DE#66, Exhibit A, ¶2).

44.  Warden Stine retired when he left Moore Haven Correctional.  (See DE#66, Exhibit A, ¶3).

45.  GEO Group, Inc. employed the medical staff at South Bay for a time period before Warden Stine started at South Bay Correctional until February 1, 2014.  (See DE#66, Exhibit A, ¶4).

46.  As of February 1,2014, Correct Care took over the medical services at South Bay Correctional Facility as a subcontractor of GEO Group, Inc.  (See DE#66, Exhibit A, ¶5).

47.  Warden Stine does not recall Plaintiff, but he has reviewed the Complaint in this matter.  (See DE#66, Exhibit A, ¶6).

48.  Warden Stine is not a medical doctor and did not attend medical school.  (See DE#66, Exhibit A, ¶7).

49.  Warden Stine does not have medical training of any type other than CPR instruction he received years ago.  (See DE#66, Exhibit A, ¶8).

50.  As Warden of South Bay, and other prisons he oversaw from 2003 through 2017, Warden Stine was responsible for the security of the facility to ensure that all inmates completed their sentences as ordered by the Court.  (See DE#66, Exhibit A, ¶9).

51.  Inmates at South Bay received medical care administered by medical providers.  (See DE#66, Exhibit A, ¶10).

52.  Warden Stine completely deferred to medical providers at South Bay Correctional as it pertains to their treatment of inmate's medical issues. (See DE#66, Exhibit A, ¶11).

53.  As Warden, Mr. Stine was not in a position to override the recommendation of medical staff as it pertains to the medical treatment of an inmate.  (See DE#66, Exhibit A, ¶12).

54.  Regarding inmate grievances pertaining to medical care, the medical staff at South Bay would provide the response to an

inmate grievance regarding a medical issue.  (<u>See</u> DE#66, Exhibit A, ¶13).

55.  Normally, as the Warden, Mr. Stine would then sign off on the medical treatment grievance response after the grievance was signed by a physician or administrative issues, by the health service administrator.  As Warden, he would ensure that medical reviewed the inmate's concern and provided a full response to the inmate's complaint/grievance that Stine would then review. Warden Stine would not disagree with medical decisions as he is not a medical person and does not have medical training. Warden Stine would ensure that the inmate received a response but did not interfere with or change the medical provider's response. (<u>See</u> DE#66, Exhibit A, ¶14).

56. Warden Stine has no reason to believe that Plaintiff did not receive competent and quality medical care at South Bay Correctional while he was the Warden at South Bay.  (<u>See</u> DE#66, Exhibit A, ¶15).

57.  During Warden Stine's tenure with GEO Group, there was no directive  from GEO Group regarding saving money on the medical care for inmates by delaying or denying medical care.  (<u>See</u> DE#66, Exhibit A, ¶16).

58.  Warden Stine was not responsible for the medical care at South Bay.  However, as Warden, he would have known if there was a directive by GEO Group regarding saving money on medical care at the expense of an inmate's health.  (<u>See</u> DE#66, Exhibit A, ¶17).

## Summary Judgment Standard

A motion for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See <u>Celotex Corp. v.</u>

Catrett, 477 U.S. 317, 322 (1986); Greenberg v. Bell-South Telecomm., Inc., 498 F.3d 1258, 1263 (11th Cir. 2007)(*per curiam*); Fed.R.Civ.P. 56(c). In accordance with *Celotex* and its progeny,[2] a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion, and identifying those portions of the record, including pleadings, discovery material, and affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.), cert. denied, 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). The non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. Celotex, 477 U.S. at 322-23. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(*quoting* First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). See

---

[2]In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered against:

> [A] party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

also <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. <u>Waddell v. Valley Forge Dental Associates, Inc.</u>, 276 F.3d 1275, 1279 (11th Cir. 2001); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); <u>Harris v. Ostrout</u>, 65 F.3d 912, 916 (11th Cir. 1995)(grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations...."); <u>Fullman v. Graddick</u>, 739 F.2d 553, 557 (11th Cir. 1984)("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Thus, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. <u>Celotex</u>, 477 U.S. at 322; <u>Barnes v. Southwest Forest Industries, Inc</u>., 814 F.2d 607, 609 (11th Cir. 1987).

If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249-50; <u>Baldwin County, Alabama v. Purcell Corp.</u>, 971 F.2d 1558 (11th Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990)(<i>citing</i> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 252). Of course, in making the determination whether genuine issues of material fact are present, the court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," <u>see</u> <u>Stewart v. Happy Herman's Cheshire</u>

10

Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997), and "resolve all reasonable doubts about the facts in favor of the nonmovant." See United of Omaha Life Ins. v. Sun Life Ins. Co., 894 F.2d 1555, 1558 (11th Cir. 1990).

## Applicable Legal Standards

The Eighth Amendment governs claims of deliberate indifference to serious medical needs.  The Eighth Amendment prohibits any punishment which violates civilized standards of decency or "involve[s] the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 102-03 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173(1976); see also Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999). "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted).  An Eighth Amendment claim predicated upon an alleged denial of medical treatment requires the plaintiff to establish both an objective and a subjective component. Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000); Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995). First, a plaintiff must set forth evidence of an objectively serious medical need. Taylor, 221 F.3d at 1258; Adams, 61 F.3d at 1543. Second, a plaintiff must prove that the prison official acted with an attitude of "deliberate indifference" to that serious medical need. Farmer, 511 U.S. at 834; McElligott, 182 F.3d at 1254; Campbell, 169 F.3d at 1363.

A serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (quotation marks and citation omitted).  The subjective component requires the plaintiff to

11

demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs. See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 298-99 (1991). Deliberate indifference is the reckless disregard of a substantial risk of serious harm; mere negligence will not suffice. Id. at 835-36. Consequently, allegations of medical malpractice or negligent diagnosis and treatment fail to state an Eighth Amendment claim of cruel and unusual punishment. See Estelle, 429 U.S. at 106. The inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" Estelle, 429 U.S. at 105-06; Wilson, 501 U.S. at 298.

The Eleventh Circuit has provided guidance concerning the distinction between "deliberate indifference" and "mere negligence." For instance, "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe County, 116 F.3d 1419, 1425 (11th Cir. 1997). The "deliberate indifference" standard may be met in instances where a prisoner is subjected to repeated examples of delayed, denied, or grossly incompetent or inadequate medical care; prison personnel fail to respond to a known medical problem; or prison doctors take the easier and less efficacious route in treating an inmate. See, e.g., Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989).

Allegations that raise only claims of mere negligence, neglect, or medical malpractice are insufficient to recover on a §1983 claim. Estelle v. Gamble, supra. In fact, once an inmate has received medical care, courts are hesitant to find that an Eighth Amendment violation has occurred. Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985). Treatment violates the Eighth Amendment only if it involves "something more than a medical

12

judgment call, an accident, or an inadvertent failure," Murrell v. Bennett, 615 F.2d 306, 310 n. 4 (5th Cir. 1980). It must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir.1986).

Moreover, the Courts have long recognized that a difference of opinion between an inmate and the prison medical staff regarding medical matters, including the diagnosis or treatment which the inmate receives, cannot in itself rise to the level of a cause of action for cruel and unusual punishment, and have consistently held that the propriety of a certain course of medical treatment is not a proper subject for review in a civil rights action. Estelle v. Gamble, supra, at 107 ("matter[s] of medical judgment" do not give rise to a §1983 claim). See Ledoux v. Davies, 961 F.2d 1536 (10th Cir. 1992) (inmate's claim he was denied medication was contradicted by his own statement, and inmate's belief that he needed additional medication other than that prescribed by treating physician was insufficient to establish constitutional violation); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), cert. denied, 450 U.S. 1041 (1981); Smart v. Villar, 547 F.2d 112, 114 (10th Cir. 1976) (same); Burns v. Head Jailor of LaSalle County Jail, 576 F.Supp. 618, 620 (N.D. Ill., E.D. 1984) (exercise of prison doctor's professional judgment to discontinue prescription for certain drugs not actionable under §1983).

It is also well settled that "[n]othing in [the applicable] case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor...." Bismark v. Fisher, 213 Fed.Appx. 892, 897 (11th Cir.2007).  Rather, the law is clear that where two alternative courses of medical treatment exist, it is not the place

of the court to second guess medical judgments, or to require that the DOC adopt the more compassionate of two adequate options. <u>See</u> <u>Layne v. Vinzant</u>, 657 F.2d 468, 474 (1st Cir.1981) (quoting <u>Westlake v. Lucas</u>, 537 F.2d 857, 860 n. 5 (6th Cir.1976)); <u>Bismark</u> <u>v. Fisher</u>, 213 F. App'x 892, 897 (11th Cir. 2007); <u>Medrano v.</u> <u>Smith</u>, 161 Fed.Appx. 596, 599 (7th Cir.2006); <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir.1989).

It is well-settled that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." <u>Miller</u> <u>v. King</u>, 84 F.3d 1248, 1261 (11th Cir.2004). Rather, such liability attaches under § 1983 only "when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." <u>Id.</u> "A causal connection may be established: (1) when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [or she] fails to do so; (2) when a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." <u>Miller</u>, 384 F.3d at 1261 (internal quotations omitted).

It is similarly well settled that a § 1983 Plaintiff cannot rely upon the theory of *respondeat superior* to hold government entities liable under § 1983. <u>See</u> <u>Monell</u>, 436 U.S. at 692 (finding that § 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"); <u>Pembaur v. Cincinatti</u>, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). "It is only when the 'execution of the

government's policy or custom ... inflects the injury' that the [entity] may be held liable." City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Outside providers for the Department of Corrections and private contractors that run or provide services for prisons, like GEO Group, do act under color of state law for purposes of § 1983 liability. Farrow v. West, 320 F.3d 1235, 1239 n. 3 (11th Cir.2003). And the above-referenced principle that *respondeat superior* is not a cognizable theory of liability under § 1983 holds true regardless of whether the entity sued is a state, municipal, or private corporation. Harvey v. Harvey, 949 F.2d 1127, 1129–30 (11th Cir.1992).

A government entity or private prison contractor does not incur § 1983 liability for injuries caused solely by its employees. Monell, 436 U.S. at 694, 98 S.Ct. 2018. Nor does the fact that a plaintiff has suffered a deprivation of federal rights at the hands of an employee infer culpability and causation. Bd. of County Com'rs v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Instead, to impose § 1983 liability on an entity acting under color of state law, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the entity had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. See Canton, 489 U.S. at 388, 109 S.Ct. 1197. In addition, a plaintiff "must identify those officials who speak with final policymaking authority for that . . . . entity concerning the act alleged to have caused the particular constitutional violation in issue." Grech v. Clayton County, 353 F.3d 1326, 1329 (11th Cir.2003).

<u>Discussion</u>

Here, there is no dispute that Plaintiff's dermatological and ophthalmologic conditions constituted serious medical needs. Indeed, defendants do not challenge this element of Plaintiff's case. Rather, they focus their arguments exclusively on the contention that Plaintiff cannot show that Dr. Heller was deliberately indifferent to those needs, or that Warden Stine and GEO Group had any custom or policy of delaying inmates treatments, or of failing to provide sufficient funds and staff to meet the medical needs of the inmates at South Bay.

*Dr. Heller*

First, with regard to Plaintiff's dermatologic care, the record establishes that Dr. Heller continuously and diligently provided Plaintiff with care. As detailed above, Dr. Heller saw Plaintiff for this condition repeatedly, issued a med pass, and prescribed countless medications and treatments of the course of the relevant time. And there is simply nothing in the record to establish that this course of treatment was anything other than proper, much less so grossly negligent as to approximate deliberte indifference. Moreover, as further set forth above, Dr. Heller also issued Plaintiff's requested "no shave pass," and approved cotton bedding, long sleeve shirts, boots, a straw hat, and other accommodations to alleviate Plaintiff's discomfort. Indeed, the only thing that can reasonably be concluded from the record is that either Dr. Heller or a colleague ordered additional medications or treatments each and every time Plaintiff had a complaint or a flare up.

The Northern District of Florida's decision in <u>Walsberg v. Florida Dept. of Corrections</u>, 2011, WL 2420244 (N.D. Fla. May 10, 2011) is instructive. The plaintiff in <u>Walsberg</u>, just as Plaintiff here, filed a complaint alleging that the course of treatment he

16

received for his dermatologic condition, in that case a burn, was insufficient. Like Plaintiff, Walsberg alleged that the particular ointment he received was not the same as what he had been previously provided and caused further damage. Id. at 3. The Court dismissed the Complaint for failing to state a cognizable claim based on deliberate indifference. The court reasoned that "[g]enerally, where, as here, an inmate receives medical treatment and care but the inmate alleges that he should have received different treatment or care the conduct does not constitute deliberate indifference." Id.

Next, with regard to Plaintiff's ophthalmologic care, the record establishes that Dr. Heller similarly continuously and diligently provided Plaintiff with care.  Although Plaintiff complains about cancelled appointments, the record establishes that those appointments were actually cancelled by Visual Health, and not Dr. Heller.  Indeed, the record confirms that Dr. Heller signed off on an approved multiple consultations with specialists.  And Dr. Heller had no authority to override the one decision by Utilization Management that denied one of Dr. Heller's requested consultations.  Moreover, the record establishes that Dr. Heller signed off on a surgical request, even when no surgery had been ordered.  And significantly, as further set forth above, Plaintiff was again evaluated afer the was transferred out of South Bay, and it was again determined that he did not meet surgical criteria. Thus, the most that record establishes is that surgical options were discussed, but were never indicated as the only and necessary course of action.

The Northern District of Florida addressed a similar situation in Adams v. Cherry, 2010 WL 6089073, N.D. Fla. (2010)(Report and recommendations adopted, 2011 WL 902234, N.D.Fla., 2011).  In Adams, the plaintiff alleged that the denial of a surgical hernia repair amounted to a deliberate indifference of his constitutional

rights. In concluding that it did not, the Court explained as follows:

> [t]he fact that surgeries … of this type are commonly performed in free society, as Plaintiff has argued, … does not mean that the failure of prison officials to provide surgery violates the Eighth Amendment. Plaintiff is not entitled to the best care available, that is, the kind of care that could be obtained if Plaintiff were not in prison or to elective procedures. The Eighth Amendment does not require that much.

Id. at 6.

In sum, as set forth above, there is no dispute that Plaintiff received continuous care for both of his conditions. And as further set forth above, once an inmate has received medical care, courts are hesitant to find that an Eighth Amendment violation has occurred. Hamm, 774 F.2d at 1575. Indeed, based on the record it is clear that Plaintiff simply takes issue with the care that he received. But it is of course also well settled that "[a] difference of opinion over matters of medical judgment does not give rise to a constitutional claim." Tedesco v. Johnson, 119 F. Supp. 2d 1320, 1327 (M.D. Fla. 2000). Thus, Plaintiff's disagreement concerning the course of his treatment is not actionable under Section 1983.

Plaintiff, for his part, fails to demonstrate the existence of any genuine issue of material fact necessitating a trial. First, Plaintiff takes issue with the precise date on which Dr. Heller began working at South Bay and disputes whether he had any part in any of Plaintiff's treatment in February of 2012. (DE#78, ¶2). However, the fact that Dr. Heller may have not started at South Bay, even if true, would nothing to advance Plaintiff's claims. Indeed, it begs the question of how Dr. Heller could be liable for alleged that deprivations that, according to Plaintiff, would have occurred before Dr. Heller ever got to South Bay.

Next, Plaintiff points to two instances on which Dr. Heller did not prescribe sunscreen, and claims that someone other than Dr. Heller approved Plaintiff's long sleeve shirt. (DE#78, ¶3). However, the fact that Dr. Heller may have not prescribed sunscreen on two occasions, and that someone else may have ordered the shirts does not create a genuine issue regarding whether Dr. Heller provided Plaintiff with treatment and care. The record is clear that Plaintiff was in fact provided with these items, and Dr. Heller has established that some of Plaintiff's care was provided by his colleagues. Stated another way, the fact that other medical providers who were attending to Plaintiff's needs provided Plaintiff with certain items does not mean that Dr. Heller was deliberately indifferent in failing to do so; the record is clear that Plaintiff's care was a team effort that spanned an extended period to time with on-going visits and treatments with multiple providers.

Plaintiff also assets that certain prescriptions for Naproxen were in fact prescribed for pain form other injuries, and not his skin condition. (DE#78, ¶6(a), 7). However, given Plaintiff's extensive medical history,[3] one minor discrepancy as to what a certain Naproxen prescription was for does not create a triable issue regarding whether Dr. Heller did in fact provide Plaintiff with regular and continuous care.

Plaintiff also takes issue with the amount of time it took from his arrival at South Bay until he was referred and approved for a dermatologic consultation. (DE#78, ¶9). However, the record is unrefuted that Plaintiff had already been evaluated by a dermatologist and had a diagnosis, and that he received care for that condition after his arrival at South Bay. Moreover, the record establishes that Plaintiff responded to varying degrees to

---

[3]As detailed in the undersigned's Preliminary Report, Plaintiff has complained of a myriad of health issues over the years of his incarceration.

the treatments that he was given while at South Bay, and that he was always seen and treated when he had a flare up.  Under these circumstances, Plaintiff's complaint about the alleged delay in referring him for a second dermatologic consultation after his arrival at South Bay amounts, at best, a difference of opinion between Plaintiff and Dr. Heller regarding when he should have been referred to a dermatologist.  But as set forth above, "[a] difference of opinion over matters of medical judgment does not give rise to a constitutional claim." Tedesco, 119 F. Supp. 2d at 1327.

Finally, Plaintiff seems to assert that, because a doctor from the National Eye Care Clinic apparently recommended on October 9, 2017 that Plaintiff have surgery, that somehow creates a genuine issue of material fact regarding whether Dr. Heller was deliberately indifferent to Plaintiff's ophthalmologic condition.  However, this does not change the fact that Dr. Heller treated Plaintiff's condition, and even signed off on a surgical request when no such recommendation had been made.  Simply stated, Plaintiff fails to explain how this demonstrates deliberate indifference by Dr. Heller, when it is undisputed that Dr. Heller is not an ophthalmologist, and that the ophthalmologists who did see Plaintiff during the relevant time did not recommend surgery.

*Warden Stine and GEO*

Here, the record is clear that Warden Stine has no medical training, and that he had no personal participation in any of Plaintiff's treatment decisions.  He therefore cannot be held liable for these decisions.  See Williams v. Limestone County, 198 F. App'x 893, 897-98 (11th Cir. 2006) (indicating that supervisory prison officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care).  And to the extent that Plaintiff may mean to claim that Warden Stine's acts of

responding to or denying grievances regarding medical issues, the filing a grievance with a supervisor does not alone make the supervisor liable for the allegedly violative conduct brought to light by the grievance, even if the grievance is denied. Weaver v. Toombs, 756 F. Supp. 335, 337 (W.D. Mich. 1989) aff'd, 915 F.2d 1574 (6th Cir. 1990); Edler v. Schwarz, 2010 WL 3211941 at *5 (N.D. Fla. May 13, 2010).

It is true that, as set forth above, a § 1983 litigant may also establish supervisory liability by showing the existence of widespread abuse and knowledge of the need to correct it, or of a unconstitutional custom or policy that led to the alleged deprivation. And as further set forth above, this is essentially the same showing that a plaintiff must make to hold an entity like the GEO Group liable under § 1983. The problem of course is that there is no evidence whatsoever of any widespread abuse or unconstitutional custom or policy that would subject either Warden Stine or GEO Group to liability under § 1983.

In this case, Plaintiff relies wholly on the unsupported, conclusory allegations of his complaint and on what happened in his particular case to establish the alleged based custom or policy of delaying inmates' medical treatment, and the alleged custom or policy of failing to provide sufficient funds and staff to meet the medical needs of the inmates at South Bay Correctional Facility. The problem for Plaintiff, however, is that neither of these are sufficient. See Miller v. Bartow Cty., Ga., 478 F. App'x 549, 550 (11th Cir. 2012)(conclusory allegations that Plaintiff was injured by unconstitutional custom or policy failed to satisfy the pleading standards set out by the Supreme Court); Harvey v. City of Stuart, 296 F. App'x 824, 826 (11th Cir. 2008)(vague and conclusory allegations in complaint failed to set forth custom or policy that led to alleged constitutional violations); City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) (plurality) ("Proof of a single

incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>" unless that incident was caused by an existing unconstitutional policy attributable to a policymaker); <u>Depew v. City of St. Marys</u>, 787 F.2d 1496 (11th Cir.1986) ("Normally, random acts or isolated incidents are insufficient to establish a custom or policy"). <u>Prieto v. Metro. Dade Cnty.</u>, 718 F. Supp. 934, 938-39 (S.D. Fla. 1989) ("four isolated incidents . . . fall well short of proving a persistent and widespread practice sufficient to establish a policy or custom"); <u>Pineda v. City of Houston</u>, 291 F.3d 325, 329 (5th Cir. 2002) ("Eleven incidents . . . cannot support a pattern of illegality in one of the Nation's largest cities and police forces"); <u>Tomberlin v. Clark</u>, 1 F. Supp. 3d 1213, 1230 (N.D. Ala. 2014)(dismissing <u>Monell</u> claim because, "[i]nstead of showing 'the repeated acts of a final policymaker,' [the plaintiff] provides only facts about his own case").

Plaintiff's response to Warden Stine and GEO Group's motion for summary judgment focuses entirely on how the record allegedly establishes that Dr. Heller was deliberately indifferent to Plaintiff's serious medical needs. (DE#78, Appendix B). Suffice it to say that, even if Plaintiff could establish that there was a genuine issue to be tried with regard to Dr. Heller's conduct, which he has not for the reasons stated above, this does nothing whatsoever to meet the standards necessary to impose liability upon Warden Stine and GEO Group (i.e., the existence of the alleged custom or policy of delaying inmates' medical treatment, and of the alleged custom or policy of failing to provide sufficient funds and staff to meet the medical needs of the inmates at South Bay).

## Conclusion

Based upon the foregoing, it is recommended that Dr. Heller's, and Warden Stine and Geo Group's motions for summary judgment

(DE#65, 66) be GRANTED, that judgment be entered in favor of the defendants, and that the case be closed.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.  Failure to file timely objections shall bar plaintiff from a *de novo* determination by the district judge of an issue covered in this report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district judge except upon grounds of plain error or manifest injustice. See 28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790,794 (1989); LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).


SIGNED this 7th day of December, 2017.


UNITED STATES MAGISTRATE JUDGE

cc:  Guillermo Fuentes
     194877
     Okeechobee Correctional Institution
     Inmate Mail/Parcels
     3420 NE 168th Street
     Okeechobee, FL 34972
     PRO SE

     Gregory A. Kummerlen
     Wiederhold, Kummerlen & Waronicki, P.A.
     340 Columbia Drive, Suite 111
     West Palm Beach, FL 33409

     Rachel Ivy Turner
     Jeffery Rodman Lawley
     Billing, Cochran, Lyles, Mauro & Ramsey, PA
     515 E Las Olas Boulevard
     Suite 600 Suntrust Bank
     Fort Lauderdale, FL 33301